*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EESAM ARABBO,

        Plaintiff-Appellant,

v

CITY OF BURTON, PAULA ZELENKO, STEPHEN HEFFNER, THOMAS MARTINBIANCO, and MICHAEL JOLIAT,

        Defendants-Appellees.

UNPUBLISHED
July 2, 2019

No. 341713
Genesee Circuit Court
LC No. 2016-107043-CZ

Before: METER, P.J., and JANSEN and KRAUSE, JJ.

PER CURIAM.

In this claim involving the Elliott-Larsen Civil Rights Act, see MCL 37.2301 *et seq.*, plaintiff appeals by right the trial court's orders granting summary disposition in favor of each defendant. We affirm.

## I. BACKGROUND

Plaintiff developed a residential housing project in Burton, Michigan, which was called Blackberry Creek Village. Blackberry Creek Village was completed in May 2004. Plaintiff borrowed more than $18 million to fund the development, which was insured by the Federal Housing Administration and secured by a mortgage. Plaintiff had difficulty making payments on the note in 2007 and 2008, and the note was assigned to the United States Department of Housing and Urban Development (HUD) in April 2009.

In July 2009, Burton's mayor inquired about purchasing the note from HUD. In November 2009, HUD offered to sell the note to the city for approximately $6.3 million. Burton's city council held meetings concerning the purchase on March 25 and March 26, 2010. Defendants Paula Zelenko, Stephen Heffner, and Thomas Martinbianco were each members of the Burton City Council who voted on the proposed purchase. Defendant Michael Joliat was an assistant city attorney who advised the council about the proposed purchase.

-1-

The notes from the meeting held on March 25, 2010, show that plaintiff proposed to give the city the money for the down payment and to arrange financing to take the city out of the picture within "three weeks." He assured the council that not one dollar of city funds would have to be used. Joliat, however, opined that the proposed deal reserved all the profit to plaintiff: "He ends up with the ownership of the property on a written down mortgage from $17 million to $6,133,000." Additionally, the meeting notes reflect that some council members were concerned about the city's ability to fund the purchase and worried that the city might end up with substantial liabilities related to the development should plaintiff be unable to secure financing.

When the council held another special meeting the next day, Martinbianco expressed serious reservations about the legality and benefits of the deal. Similarly, although Zelenko expressed the "utmost respect" for plaintiff and recognized his contributions to the community (a sentiment echoed by other councilmembers), she stated that she could not in good conscience vote to put the city on the hook for this property. Joliat indicated that there was a good argument that the purchase of the note might contradict the law, but he conceded that he took a conservative approach to the law. Heffner opined that the risk was too great for the city and stated that he would be voting "no" for that reason. The council voted down the proposal in a 4 to 2 vote with Martinbianco, Zelenko, and Heffner voting to reject the proposal along with one other council member. HUD eventually sold the note to a private entity for $6.5 million.[1]

---

[1] At appellate oral arguments in this case, on two occasions during his rebuttal argument, plaintiff's counsel stated that, after denying plaintiff's proposal, the city sold the note on the Blackberry Creek Housing development to a private entity for $6.5 million. As an initial matter, we note that this argument was an improper subject for rebuttal given that no mention of any subsequent sale was made in counsel's initial argument or defendant's response.

More importantly, counsel's argument materially misrepresented the factual record in this case. Suffice it to say that there is no record whatsoever of the city purchasing the note from HUD or selling the note to any entity. Indeed, in plaintiff's counsel's own appellate brief, he appears to argue that HUD—not the city—sold the note to a private entity. In pertinent part, plaintiff's counsel stated:

> On March 26, 2010, a second meeting took place where the city council voted 4-2 against the purchase of the note. . . . After that plaintiff was denied the opportunity to purchase the note from the City of Burton, the note was eventually sold to a private entity for $6,501,538.13.

Plaintiff's counsel supported this statement with a citation (without any pincite) to two volumes of plaintiff's deposition testimony. In his deposition, plaintiff testified that HUD—not the city—sold the note; plaintiff, however, could not provide any details about the subsequent purchase, except for his belief that the property sold for a similar value as was offered to the city. There is no other evidence in the record from which we may infer that, after declining plaintiff's proposal to purchase the note and sell it to him, the city purchased the note from HUD and sold it to another entity. To the contrary, during discovery plaintiff produced an email from a HUD

In March 2013, plaintiff sued the city, Zelenko, Heffner, Martinbianco, and Joliat in federal court for violating his civil rights by refusing to purchase his note and mortgage on the basis of his race or ethnicity. In May 2016, the federal trial court dismissed plaintiff's claim under 42 USC 1983 and declined to exercise supplemental jurisdiction over the state-law claim.

In June 2016, plaintiff sued the city, Zelenko, Heffner, Martinbianco, and Joliat in state court. He alleged that defendants unlawfully discriminated against him in the provision of a public accommodation or service by opposing his proposal to have the city purchase the note and mortgage associated with his development. He also asserted that the vote amounted to a civil conspiracy and the intentional infliction of emotional distress.

The defendants each moved for summary disposition on various grounds. After holding two hearings on the motions, the trial court granted the motions and dismissed plaintiff's claims. The trial court stated that it believed that the federal-court case collaterally estopped it from determining whether there was evidence that the councilmembers voted out of a discriminatory animus and whether the councilmembers were absolutely immune from tort liability for their votes. Nonetheless, the trial court addressed these issues independently, holding that the council members were in fact immune from liability for their votes as a legislative decision and that plaintiff failed to show discriminatory animus. This appeal followed.

## II. ANALYSIS

On appeal, plaintiff argues that the trial court erred in several different ways when it granted defendants' motions for summary disposition and dismissed his claim under MCL 37.2302(a).[2] "A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim, and is appropriately granted when, except as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Tomra of North America, Inc v Dep't of Treasury*, 325 Mich App 289, 294; ___ NW2d ___ (2018).

We first address plaintiff's claim that the trial court erred when it determined that his civil-rights claim had to be dismissed under MCR 2.116(C)(10) because he failed to present evidence sufficient to create a question of fact as to whether defendants voted on the basis of a discriminatory animus. To state a claim of unlawful discrimination in violation of MCL 37.2302(a), plaintiff had to establish four elements: "(1) discrimination based on a protected

official to councilmember Danny Wells indicating that HUD had sold the property to a private entity for $6.5 million at an April 2010 auction.

As will be made apparent by this opinion, had counsel's assertion been factually accurate, it may have provided evidence sufficient to create a prima facie case of discrimination. Given, however, that there is no evidence to support the assertion, we decline to discuss further counsel's egregious misrepresentation of the record.

[2] Plaintiff has not challenged the trial court's decision to dismiss his conspiracy and intentional infliction of emotional distress claims. Therefore, those claims are not before this Court.

characteristic (2) by a person, (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations (4) of a place of public accommodation." *Haynes v Neshewat*, 477 Mich 29, 35; 729 NW2d 488 (2007). The burden shifting test applicable to other sections of the Civil Rights Act applies to a claim under MCL 37.2302. See *Schellenberg v Rochester, Mich Lodge 2225 of the Benevolent and Protective Order of Elks of the USA*, 228 Mich App 20, 32; 577 NW2d 163 (1998). Therefore, a plaintiff alleging discrimination under MCL 37.2302 bears the initial burden of showing a *prima facie* case of discrimination; once he does so, the burden shifts to the defendants to establish legitimate reasons for their actions. *Id*. Once the defendants meet this burden, the burden shifts back to the plaintiff to show that the proffered reasons were merely pretextual. *Id*.

In response to Joliat's motion for summary disposition, plaintiff cited his own deposition testimony as evidence that Joliat advised the council members against authorizing the purchase of the note and mortgage on the basis of a bias against persons of Arabic descent. Plaintiff testified that Joliat told him at the meeting held on March 25 that the purchase of the note would only "benefit me [plaintiff] and it makes me [plaintiff] a rich person." Plaintiff conceded that the purchase would actually benefit him, but he felt that Joliat's "demeanor" and "tone" were offensive and that something "deeper" was at issue. He also stated that Joliat told him that Zelenko was never going to "let this happen" and that Joliat questioned the authenticity of plaintiff's cashier's check for the down payment. Plaintiff also claimed that Joliat made a reference to plaintiff's middle-eastern ethnicity to another councilmember, Danny Wells, who was sitting next to him. Plaintiff stated that he heard a whisper and could not say what the comment was. It was his "understanding" that the comment was a reference to his ethnicity and that he was going to get rich off the city's purchase. Finally, plaintiff testified that he heard Joliat say that it was the "happiest day of his life that this thing didn't go through."

Wells testified at his deposition that Joliat stated that "these people are always trying to increase their profit margin." Wells later testified that Zelenko made a similar remark that "these people are always trying to get over and—and make more money." Wells said he assumed she was referring to Middle Eastern people. Wells testified, however, that he never heard Martinbianco or Heffner make any racially derogatory remarks about Arabbo. These were the only two inappropriate comments that Wells heard.

When opposing Martinbianco's motion for summary disposition, Arabbo asserted his testimony wherein he stated that Martinbianco later shared that he "sided with Mrs. Zelenko on the wrong basis." He said Martinbianco told him that there was "nothing that he could do" because Zelenko "had it out for me [plaintiff] and [that] he [Martinbianco] had no choice but to go along with her." Plaintiff testified that Martinbianco said that Zelenko stated that she did not "want to help folks like [him]," and plaintiff stated that Martinbianco said that Zalenko was referring to plaintiff's nationality. Plaintiff also stated that he heard Zelenko refer to him as the

"Arab who has the property in Burton, the apartments" several months after the council's vote at a fundraiser.[3]

Plaintiff's case rests entirely on speculation. While we do not endorse Zelenko's description of plaintiff as "the Arab," there is nothing in the record from which we can conclude that this comment was anything but a stray descriptor. Zelenko did not make the comment until several months after the council vote and there is no evidence relating this stray remark to the council's voting process. See *Krohn v Sedgwick James of Michigan, Inc*, 244 Mich App 289, 298; 624 NW2d 212 (2001) (noting that courts may examine a stray remark by considering whether the comments were made within the scope of employment; whether they were related to the decision-making process; whether they were vague, ambiguous, or isolated; and whether they were proximate in time to the challenged act). Indeed, there is no evidence that Zelenko made the comment derogatorily rather than out of want for a better descriptor, particularly given Zelenko's earlier statement that she had the "utmost respect" for plaintiff.

As for the remaining evidence, plaintiff has provided only assumptions that councilmembers referred to his race. For instance, plaintiff took issue with Joliat's "demeanor" and "tone," believing that something "deeper" was at issue. Plaintiff offered several instances of councilmembers referring to "these people," but there is nothing tying the comments to plaintiff's race. The comments could just as likely refer to plaintiff's status as a developer, business owner, landlord, etc.—particularly given that two of the comments refer to plaintiff's attempt to increase his profit margin. It is not lost on this Court that plaintiff was asking the city to approve a multimillion-dollar financial obligation that primarily benefited plaintiff. While the term "these people" certainly has negative connotations—a comment public servants might, upon reflection, avoid—council's questioning of plaintiff's financial motives was certainly warranted when analyzing such a large financial obligation. Accordingly, we agree with the trial court that plaintiff failed to set forth a *prima facie* case of unlawful discrimination against any defendant.

Moreover, even if we could find that the above-referenced evidence was sufficient to present a *prima facie* case, the defendants established a nonpretextual legitimate justification for their votes. Again, plaintiff was asking the city to take on more than $6 million in financial obligations which primarily benefited plaintiff. Plaintiff has offered no evidence that the council approved similar deals for other private citizens, see *Schellenberg*, 228 Mich at 34 (noting that the essence of a discrimination claim is that the defendant treated similarly situated persons differently because of a protected characteristic), and several councilmembers were concerned that the proposal was actually illegal. The proposal failed 4 to 2 and, of the four "no" votes, plaintiff has only offered evidence that Zelenko was biased against him. The fact that plaintiff could not even offer evidence that his race or national origin played a role in three of the four no

---

[3] We note that Arabbo could not identify anything that Martinbianco or Heffner stated that suggested that they acted out of a discriminatory animus; rather, it was his position that they participated in Zelenko's discrimination by siding with her.

votes (including two votes from defendants in this case) underscores that the financial and legal concerns regarding the proposal were not merely pretextual reasons to reject it.

Therefore, because plaintiff failed to set forth a *prima facie* case of discrimination against any defendant or, alternatively, failed to rebut the defendants' stated, nonpretextual reasons for rejecting his proposal, we conclude that the trial court did not err by granting summary disposition to defendants under MCR 2.116(C)(10). Given our resolution of this claim of error, we decline to address plaintiff's claims that the trial court improperly applied the doctrine of collateral estoppel and improperly applied the law applicable to governmental immunity.

Affirmed. As the prevailing parties, defendants may tax their costs. MCR 7.219(A).


/s/ Patrick M. Meter
/s/ Kathleen Jansen